UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON

CIVIL ACTION NO. 07-420-GWU

PAMELA SULLIVAN, PLAINTIFF,

VS. **MEMORANDUM OPINION**

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY, DEFENDANT.

### INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of her application for Supplemental Security Income (SSI). The appeal is currently before the court on cross-motions for summary judgment.

### APPLICABLE LAW

The Sixth Circuit Court of Appeals has set out the steps applicable to judicial review of Social Security disability benefit cases:

1. Is the claimant currently engaged in substantial gainful activity? If yes, the claimant is not disabled. If no, proceed to Step 2. See 20 C.F.R. 404.1520(b), 416.920(b).

2. Does the claimant have any medically determinable physical or mental impairment(s)? If yes, proceed to Step 3. If no, the claimant is not disabled. See 20 C.F.R. 404.1508, 416.908.

3. Does the claimant have any severe impairment(s)--i.e., any impairment(s) significantly limiting the claimant's physical or mental ability to do basic work activities? If yes, proceed to Step 4. If no, the claimant is not disabled. See 20 C.F.R. 404.1520(c), 404.1521, 416.920(c), 461.921.

1

4. Can the claimant's severe impairment(s) be expected to result in death or last for a continuous period of at least 12 months? If yes, proceed to Step 5. If no, the claimant is not disabled. See 20 C.F.R. 404.920(d), 416.920(d).

5. Does the claimant have any impairment or combination of impairments meeting or equaling in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing of Impairments)? If yes, the claimant is disabled. If no, proceed to Step 6. See 20 C.F.R. 404.1520(d), 404.1526(a), 416.920(d), 416.926(a).

6. Can the claimant, despite his impairment(s), considering his residual functional capacity and the physical and mental demands of the work he has done in the past, still perform this kind of past relevant work? If yes, the claimant was not disabled. If no, proceed to Step 7. See 20 C.F.R. 404.1520(e), 416.920(e).

7. Can the claimant, despite his impairment(s), considering his residual functional capacity, age, education, and past work experience, do other work--i.e., any other substantial gainful activity which exists in the national economy? If yes, the claimant is not disabled. See 20 C.F.R. 404.1505(a), 404.1520(f)(1), 416.905(a), 416.920(f)(1).

Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).

Applying this analysis, it must be remembered that the principles pertinent to the judicial review of administrative agency action apply. Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to

support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight.  Garner, 745 F.2d at 387.

One of the detracting factors in the administrative decision may be the fact that the Commissioner has improperly failed to accord greater weight to a treating physician than to a doctor to whom the plaintiff was sent for the purpose of gathering information against his disability claim.  Bowie v. Secretary, 679 F.2d 654, 656 (6th Cir. 1982).  This presumes, of course, that the treating physician's opinion is based on objective medical findings.  Cf. Houston v. Secretary of Health and Human Services, 736 F.2d 365, 367 (6th Cir. 1984); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984).  Opinions of disability from a treating physician are binding on the trier of fact only if they are not contradicted by substantial evidence to the contrary.  Hardaway v. Secretary, 823 F.2d 922 (6th Cir. 1987).  These have long been well-settled principles within the Circuit.  Jones, 945 F.2d at 1370.

Another point to keep in mind is the standard by which the Commissioner may assess allegations of pain.  Consideration should be given to all the plaintiff's symptoms including pain, and the extent to which signs and findings confirm these symptoms.  20 C.F.R. § 404.1529 (1991).  However, in evaluating a claimant's allegations of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine:  (1)

>whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Duncan v. Secretary of Health and Human Services, 801 F.2d 847, 853 (6th Cir. 1986).

Another issue concerns the effect of proof that an impairment may be remedied by treatment. The Sixth Circuit has held that such an impairment will not serve as a basis for the ultimate finding of disability. Harris v. Secretary of Health and Human Services, 756 F.2d 431, 436 n.2 (6th Cir. 1984). However, the same result does not follow if the record is devoid of any evidence that the plaintiff would have regained his residual capacity for work if he had followed his doctor's instructions to do something or if the instructions were merely recommendations. Id. Accord, Johnson v. Secretary of Health and Human Services, 794 F.2d 1106, 1113 (6th Cir. 1986).

In reviewing the record, the Court must work with the medical evidence before it, despite the plaintiff's claims that he was unable to afford extensive medical work-ups. Gooch v. Secretary of Health and Human Services, 833 F.2d 589, 592 (6th Cir. 1987). Further, a failure to seek treatment for a period of time may be a factor to be considered against the plaintiff, Hale v. Secretary of Health and Human Services, 816 F.2d 1078, 1082 (6th Cir. 1987), unless a claimant simply has no way

to afford or obtain treatment to remedy his condition, McKnight v. Sullivan, 927 F.2d 241, 242 (6th Cir. 1990).

Additional information concerning the specific steps in the test is in order.

Step six refers to the ability to return to one's past relevant category of work. Studaway v. Secretary, 815 F.2d 1074, 1076 (6th Cir. 1987). The plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). However, both 20 C.F.R. § 416.965(a) and 20 C.F.R. § 404.1563 provide that an individual with only off-and-on work experience is considered to have had no work experience at all. Thus, jobs held for only a brief tenure may not form the basis of the Commissioner's decision that the plaintiff has not made out its case. Id. at 1053.

Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities.  20 C.F.R. § 404.1567(b).  "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing.  20 C.F.R. § 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990).  If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however, merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid.  Ibid.

In such cases, the agency may be required to consult a vocational specialist. <u>Damron v. Secretary</u>, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. <u>Varley v. Secretary of Health and Human Services</u>, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The plaintiff, Pamela Sullivan, was found by an Administrative Law Judge (ALJ) to have "severe" impairments consisting of complaints of chronic back pain, a history of kidney stones, migraine headaches, a history of left shoulder pain (status post surgery), recurrent upper respiratory infections, Type 2 diabetes mellitus with no complications, and an anxiety disorder. (Tr. 18). Nevertheless, based in part on the testimony of a Vocational Expert (VE), the ALJ determined that Mrs. Sullivan retained the residual functional capacity to perform a significant number of jobs existing in the economy, and therefore was not entitled to benefits. (Tr. 21-6). The Appeals Council declined to review, and this action followed.

At the administrative hearing, the ALJ asked the VE whether the plaintiff, a 34-year-old woman with a high school education and work experience as a sewing machine operator and stock clerk, could perform any jobs if she were capable of "medium" level exertion and also had the following non-exertional restrictions. (Tr.

813). She: (1) could only occasionally climb; (2) could only occasionally lift or reach overhead with her left arm; (3) could perform no fine manipulation with the left hand; (4) could have no exposure to pulmonary irritants such as dust, fumes, smoke, chemicals, or noxious gases; and (5) had a "limited but satisfactory" ability to deal with coworkers, the public, and work stresses. (Id.). The VE responded that there were jobs that such a person could perform, and proceeded to give the numbers in which they existed in the state and national economies. (Tr. 813-14).

On appeal, this court must determine whether the hypothetical factors selected by the ALJ are supported by substantial evidence and that they fairly depict the plaintiff's condition. There is an additional issue in that the plaintiff had originally filed an application for Disability Insurance Benefits (DIB), but her Date Last Insured (DLI) was December 31, 2002 (Tr. 60) and she amended her onset date to May 31, 2005 and abandoned the DIB claim (Tr. 797). Consequently, the issue is her condition after she filed her SSI application on June 21, 2005.

The main issue presented by the plaintiff in her appeal is the propriety of the ALJ's decision to reject the opinions of three examining physicians, at least two of whom were treating sources. In view of the factual situation in the present case, the court agrees with the plaintiff.

Mrs. Sullivan alleged disability due to left shoulder and neck pain, right hip pain, knee pain, high blood pressure, and kidney stones. (Tr. 70). She testified to

having a long history of kidney stones, having had surgery at the age of 16, and stated that the stones kept forming despite several procedures to break them up without surgery.  (Tr. 806).  She stated it was extremely painful when she could not pass a stone.  She had neck and shoulder pain, despite having surgery on the shoulder, and lower back pain running down to her foot.  (Tr. 803-4).  She described severe headaches, as much as two or three times a week, and stated that she had lesser headaches more or less constantly.  (Tr. 804-5).  She had to go to the emergency room on several occasions in order to obtain shots to relieve the migraines.  (Tr. 805).  Additionally, she testified to having carpal tunnel surgeries twice in her left hand and once in the right, but was still having problems.  (Tr. 807). She was using a breathing machine for sleep apnea and in order to help her headaches, but she was still getting the headaches.  (Tr. 809-10).  She had difficulty sleeping due to the CPAP machine or, at times, leg or back pain.  (Tr. 811-12).  She described emotional problems, particularly depression, frustration, and spells of anger.  (Tr. 808-9).

      Much of the extensive medical evidence in the transcript predates the alleged onset date by years, but confirms a long history of treatment for kidney stones. (E.g., Tr. 143, 184, 222, 246, 353).  Most recently, her urologist commented in March, 2006 that, although a CT scan showed stones embedded in both kidneys, he felt that none would cause an obstruction or any other problems and he did not

feel that further treatment was indicated. (Tr. 734). The records also show a history of shoulder pain, and surgeries for carpal tunnel syndrome in both the left and the right wrists in April, 2004. (Tr. 341-2, 466-7). Records from just before the onset date show that Dr. Yasser Nadim performed an arthroscopic decompression of the left shoulder on April 28, 2005, after which the plaintiff was released to perform activities as tolerated. (Tr. 383). On June 16, 2005, he reported that the plaintiff was comfortable with her left shoulder and pleased with the results. (Tr. 382). Due to complaints of back pain, Dr. Nadim obtained an MRI of the lumbar spine, which showed degenerative facet disease and mild to moderate narrowing, but no herniated discs. (Tr. 382, 385). An MRI of the right knee after complaints of swelling and giving way showed no acute abnormality. (Tr. 382, 384). Dr. Nadim referred his patient to a neurosurgeon for further evaluation.

Dr. Amr O. El-Naggar, a neurosurgeon, evaluated the plaintiff for complaints of low back pain radiating down the right leg and complaints of recurrent left-sided carpal tunnel syndrome beginning in July, 2005. (Tr. 427). He found some tenderness of the lumbar spine upon examination, a positive Tinel's sign bilaterally and noted EMG/NCV results which were positive on both sides. (Tr. 428-9, 704). Following another carpal tunnel surgery release, the plaintiff stated that her left-sided symptoms were improved but still somewhat present. (Tr. 422, 424, 438-9). As of December, 2005, her symptoms on the right side were not significant. (Tr.

07-420  Pamela Sullivan

420).  After another MRI of the lumbosacral spine in October, 2006 (Tr. 743), Dr. El-Naggar stated that it showed only mild facet hypertrophy and mild disc dessication with no evidence of herniation or compression (Tr. 746).  He did not recommend surgery and referred her to physical therapy, also suggesting that she could be referred to a pain clinic for injections if she did not improve in four to six weeks. (Id.).  Dr. Howard Lynd, a specialist in pain management, treated Mrs. Sullivan with a series of injections early in 2007, and the physician noted a "positive response" to the first two injections.  (Tr. 774).  Neither physician provided any functional assessment.

The plaintiff submitted office notes from her family physicians at Monticello Medical Associates, where Dr. Sherrell Roberts appears to have been her primary treating physician since approximately October, 2002.  (Tr. 574-627).  She was treated and referred for the carpal tunnel problems, shoulder pain and numbness, sinus problems, headaches, diabetes and high cholesterol, and depression. (E.g., Tr. 588, 592).  Dr. Roberts referred his patient to both Dr. Nadim, as previously noted, and to Dr. P.D. Patel, a neurologist, for treatment of her headaches.  (Tr. 701).  Dr. Patel felt that she was having several different types of headaches, prescribed the medication Depakote and recommended a sleep study (Tr. 699-701). Although the Depakote was reportedly helpful, he added several more medications.

(Tr. 697).  He also provided the plaintiff wrist splints in June, 2006, finding objective signs that her carpal tunnel problem had returned.  (Tr. 767).

Dr. Roberts provided a functional capacity assessment on December 8, 2005 stating that the plaintiff had been diagnosed with renal stones, depression, diabetes mellitus, hyperlipidemia, migraine headaches, shoulder pain, and carpal tunnel syndrome.  (Tr. 405).  He limited his patient to "light" level exertion with a total of sitting, standing, and walking, no more than four hours each in an eight-hour day, occasionally crawling and climbing, and limiting her from using either arm for reaching and from using the left hand or arm for fine manipulation or grasping.  (Tr. 405-6).  He opined that pain would frequently interfere with her attention and concentration, and she would miss five to six days of work per month.  (Tr. 406-7).

Dr. Patel stated in January, 2007 that he had treated Mrs. Sullivan for mixed headaches, chronic low back pain, carpal tunnel syndrome, possible obstructive sleep apnea, and depression.  (Tr. 751).  She had constant headaches and periods of severe intractable headaches with visual symptoms, nausea, and vomiting.  (Id.). She had no relief with migraine medications and had to go to the emergency room to receive narcotics and anti-nausea medications.  Her pain was significant enough to interfere with her attention for routine tasks, and, like Dr. Roberts, Dr. Patel felt that she would miss five to six days of work per month.  (Id.).  He opined that she would have an "extreme" impairment in her ability to tolerate the ordinary stresses

associated with daily work activities and a "marked" impairment of her ability to accept instructions and respond appropriately to criticism from supervisors, perform routine tasks at a consistent and appropriate pace, respond appropriately to changes in the work setting, and complete a normal workday and workweek without interruptions from psychologically-based symptoms.  (Tr. 752).

A third source, Dr. Robina Bokhari, a psychiatrist, had treated the plaintiff on three occasions in late 2005, diagnosed a generalized anxiety disorder and a panic disorder without agoraphobia and assigned a Global Assessment of Functioning (GAF) score of 50.  (Tr. 390-2).  A GAF score in this range reflects serious symptoms or any serious impairment in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders (4th Ed.--Text Revision), p. 34.  Dr. Bokhari prepared a mental residual functional capacity assessment on January 24, 2006 listing an "extreme" limitation in Mrs. Sullivan's ability to maintain attention and concentration for two hour segments and "marked" limitations in many other areas.  (Tr. 561-3).

The above statements represent the only opinions by medical professionals regarding the plaintiff's functional capacity for the period after her alleged onset date.  The ALJ indicated that state agency physicians and mental health experts had reviewed the record and found that Mrs. Sullivan did not have a severe physical impairment or a medically determinable mental impairment.  (Tr. 19-20).  These

07-420 Pamela Sullivan

sources actually indicated that they were preparing their reports as of the plaintiff's DLI, December 31, 2002 (Tr. 710, 722, 726-7, 729). It does not appear that any of the sources gave opinions concerning the relevant period, nor, in any case, did they review the entire record or comment on the reasons that their opinions differed from the examining sources. Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994). The ALJ did not give very specific reasons for declining to accept the physical restrictions of Dr. Roberts, although noting that the objective evidence did not support the degree of pain and functional limitations alleged, and opined that a majority of her treatment had been conservative with no referrals for surgery or other aggressive measures. (Tr. 23). Immediately after saying there had been no referrals for surgery or other aggressive measures, the ALJ went on to state that there had been improvement in her symptoms after her bilateral carpal tunnel release procedures and arthroscopic decompression of the left shoulder. (Id.). Apart from the inconsistency of saying that there had been no referrals for surgeries when the plaintiff clearly underwent several surgeries, the record is far from clear that the carpal tunnel surgeries, which were performed on multiple occasions, resulted in permanent improvement, in light of Dr. Patel's July 11, 2006 office note which includes objective findings consistent with recurrent carpal tunnel syndrome. (Tr. 767). The treating physician's limitation to light level exertion with restrictions on walking, standing, and sitting are not self-evidently inconsistent with a lower back

impairment that, even if it was not serious enough to require surgery, was serious enough to require referrals for physical therapy and to a pain clinic for injections. Again, this is not a situation in which there are competing opinions from different medical professionals; there is only the opinion of Dr. Roberts with regard to the plaintiff's physical restrictions. Particularly in view of the fact that Dr. Roberts was a treating source who ordered extensive testing and made referrals, the court has no hesitation in concluding that additional development is needed if his opinion is to be rejected.

Regarding the alleged disability related to migraine headaches, the ALJ correctly noted that the plaintiff had reported a significant improvement in November, 2006 after starting regular use of a CPAP machine. (Tr. 768). By late January, 2007, however, she was again reporting poor sleep and sleep fragmentation to Dr. Lynd (Tr. 769), which conditions had been thought to be the cause of her headaches (Tr. 755). Her testimony at the January 11, 2007 administrative hearing was also to the effect that her headache problem continued despite the CPAP machine. (Tr. 805, 810). In other words, although there is <u>one</u> office note which suggests that the plaintiff's headache problem resolved with the use of a CPAP machine, the evidence is not so conclusive as to clearly discredit the opinion of Dr. Patel, which was not given until after treatment with the CPAP machine was initiated. (Tr. 751). The Sixth Circuit has noted that "in evaluating .

07-420  Pamela Sullivan

. . [an] episodic disease, consideration should be given to the frequency and duration of the [disease's] exacerbations, the length of the remissions, and the evidence of any permanent disabilities." Wilcox v. Sullivan, 917 F.2d 272, 277 (6th Cir. 1990).  In the context of this case, the ALJ has failed to adequately explain why the opinion of Dr. Patel should not be treated as a valid medical opinion regarding the conditions for which he had been giving her extensive treatment, particularly in light of the fact that there is no countervailing opinion from any medical source.

      Finally, the ALJ cited the plaintiff's hobbies and interests as being inconsistent with her allegations.  He described these interests as including cooking, sewing, going to flea markets, reading, watching television, and crafts.  (Tr. 23).  The plaintiff did list these interests in a function report from August 5, 2005, and also said that she had no problem with reading or watching TV.  (Tr. 116).  However, she also said she had problems using her hands to cook and sew, and going to a flea market or standing and walking caused back and shoulder pain.  (Id.).  Clearly, viewed in context, the plaintiff did not simply admit that she was able to use her hands for cooking, sewing, and crafts, or indicate that she could attend flea markets with no problems.  The remainder of her function report states that she needed help to perform some self-care activities such as dressing and washing her hair, and performing household chores.  (Tr. 113-14).  Viewed as a whole, the plaintiff described her activities as being highly limited.  The ALJ also opined that

07-420 Pamela Sullivan

the opinions of Dr. Bokhari and Dr. Patel were "internally inconsistent" (Tr. 24) without identifying any internal inconsistencies, making it difficult to evaluate this rationale. See 20 C.F.R. § 416.927(d)(3). Dr. Bokhari provided a rationale for her restrictions which included her evaluation of the plaintiff's emotional problems as well as an indication that her medications could cause sleepiness. (Tr. 536). Her restrictions were generally consistent with Dr. Patel, who was considering both medical and psychiatric conditions. Although the plaintiff did not continue treatment with Dr. Bokhari, a factor which the ALJ interpreted negatively (Tr. 23), the Sixth Circuit has cautioned that it is poor practice to chastise an individual with a mental impairment for lack of diligence in seeking rehabilitation. Blankenship v. Bowen, 874 F.2d 1116, (6th Cir. 1989). Once again, medical opinions to the contrary are lacking, and on remand the ALJ should, at a minimum, obtain an opinion from a medical adviser with the opportunity to review all of the evidence.

The decision will be remanded for further consideration.

This the 23rd day of September, 2008.



Signed By:

<u>G. Wix Unthank</u>

**United States Senior Judge**

17